Shipman vs. The State.

## SHIPMAN vs. THE STATE.

COMMISSIONERS OF NORTHERN HOSPITAL FOR THE INSANE. *(1) Their power to contract for plans of building, etc.*

CONTRACT OF PUBLIC OFFICERS. *(2) Cannot divest themselves of discretion to discharge employee. (3) Measure of employee's recovery. (4, 5) Legislative ratification.*

EVIDENCE. *(6) Judicial notice of public records.*

1. Under sec. 6, ch. 39, Laws of 1870, the building commissioners of the Northern Hospital for the Insane had authority to contract for, and procure, plans, drawings and specifications for the entire hospital building contemplated by that act, and not merely for that portion thereof for the erection of which an appropriation was therein made.

2. The power of the commissioners to discharge at their discretion the building superintendent whom they should employ, was vested in them for the public benefit; and they could not be divested of that power by any contract entered into by them with the person so employed, where such contract was not *ratified* by the legislature.

3. The commissioners contracted with plaintiff for plans and specifications for the entire hospital, and employed him to superintend the whole work, agreeing to pay for both services "five per cent. on the cost of construction." Before the entire building was completed, plaintiff was discharged from service as superintendent of its construction, by the *trustees* of the hospital, in accordance with authority given to them by ch. 176 of 1872. *Held*, that he is entitled to recover the contract price for his plans and specifications and services as superintendent up to the time of his discharge; and also to recover *quantum meruit* for his plans and specifications of that portion of the work which he did not superintend; but in no case can he recover *more* than the contract price for both services.

4. If the legislature, with full knowledge of the terms of the contract entered into by the commissioners with the plaintiff, and of all the facts relating thereto, had recognized and acted upon it, making appropriations to complete the hospital building upon its assumed validity, that would constitute a *ratification* of the contract; but such ratification can be shown only by some action of both houses, by statute or resolution.

5. In 1871 the legislature authorized the commissioners to construct certain portions of said hospital building "according to the plan adopted by said board and approved by the governor;" in 1872 it authorized them to construct the center building; and in 1873 it appropriated a certain sum "for the use of" said hospital. The complaint alleges that in 1871 the commissioners made their first annual report to the governor, and in

Shipman vs. The State.

1872 their second annual report to him, and in the winter of 1873 spe-
cially reported to the legislature, and in all such reports stated the fact
of the making of said contract with plaintiff and the compensation
agreed to be paid him, etc., and set forth in general terms, and in the
last mentioned report in detail, said contract. *Held,* that these facts do
not show a legislative ratification of said contract.

6. *It seems* that the court will not take judicial notice of matters appearing
in the journal of a legislative body.

The plaintiff brought his action in this court to recover
upon a contract alleged to have been made with him pursuant
to law, by the building commissioners of the "Additional In-
stitution for the Insane," now known in law as the Northern
Hospital for the Insane.*    The complaint avers, in substance,

---

* Ch. 39, Laws of 1870, contains the following provisions:

"Section 6.    The said board of building commissioners, after consultation
with the medical superintendent of the present state hospital for the insane,
shall, at the earliest day practicable, procure plans, drawings and specifica-
tions for the buildings necessary and proper for said institution, the general
features of which shall be similar to the present state hospital for the insane,
with such modification as experience may dictate, but the plan determined on
by the board shall be such as will admit of future enlargement, so as to pre-
serve the symmetry, and, be, when ultimately completed, of capacity not less
than the present hospital building at Madison: *provided*, that the erection only
of such portion of such building shall be undertaken by the said board under
the provisions of this act, as may be completed and made ready for occupancy
by the appropriation herein made.

"Section 7.    When the said board of building commissioners shall have
obtained the proper plans of building, to be approved by the governor, they
shall advertise for thirty days in one paper in Madison, Milwaukee, and three
other prominent points in the state, for sealed proposals for the erection of
such buildings hereby authorized, commencing with one of the wings, accord-
ing to the plans and specifications determined on, with such conditions as they
shall deem necessary to properly guard the interests of the state; and they are
hereby empowered to contract with the lowest responsible bidder or bidders,
for the erection of the said buildings, which shall be completed on or before
the first day of January, A. D. 1872, said contractor or contractors to give ad-
equate security for the faithful performance of said contract.

"Section 8.    Said board shall have power to appoint and discharge at their
discretion a competent building superintendent, whose duty it shall be to su-
perintend the work as it progresses, and shall receive such compensation as
the board shall determine."

the following facts: In pursuance of ch. 39, Laws of 1870, the ' building commissioners, duly appointed and qualified under that act, employed the plaintiff during that year to prepare plans, drawings and specifications for the buildings necessary and proper for said institution, in accordance with the requirements of said act, and to provide for a complete and entire hospital, to be, when ultimately completed, of a capacity not less than that of the hospital for the insane near Madison. After the plan proposed had been submitted by plaintiff to the commissioners for examination so far as then prepared, they entered into a certain written contract with him. This contract is set out in the complaint, and consists of a written proposal submitted to the commissioners by the plaintiff, under date October 26, 1870, and a written acceptance of said proposal indorsed thereon, with the signatures of all the commissioners, under the same date. The proposal was in these words: " I hereby propose to furnish full and complete plans, specifications and working drawings for the new state hospital for the insane, to be erected at Oshkosh, Wis., and to superintend the construction of the same in an efficient and faithful manner, so as to properly protect the interests of the state, for the sum of five per cent. on the cost of construction." Afterwards, on the same day, the plans prepared for such institution by plaintiff as such architect, were unanimously adopted by said board of commissioners, and their adoption was declared by an indorsement thereon signed by them all; and they were also approved by the governor, and his approval indorsed thereon November 7, 1870. The plans here referred to were the principal general elevations and floor plans for the entire building, and were designed for the construction of a complete hospital building similar to that near Madison, and of a capacity not less, to be composed of a central building for the administrative department, extensive wings for the accommodation of patients, and large buildings in the rear of and connected with the central building, for the

domestic department, together with heating, ventilating and cu-
linary apparatus and arrangements, a complete system of sewer-
age and surface and underground drainage extending from and
around said buildings to and into the waters of Lake Winne-
bago, as well as gas works for lighting the institution, and
waterworks for supplying it with water. Immediately after
said contract was entered into, plaintiff completed said plans,
and thereafter the specifications and working plans for the en-
tire work, under the direction of said commissioners and of
the trustees subsequently appointed, during his continuance in
such service under said contract; and the buildings have since
been completed without any substantial deviation from said
plans and specifications, except a change made by authority of
the legislature in a part of the central building, for which
change plaintiff prepared all the plans, specifications and draw-
ings, and superintended the construction. " Such plans, spec-
ifications and drawings, without superintendence, were reason-
ably worth, and worth by the ordinary and current prices paid
for such services, and proportionately under the contract made
with said board, the sum of three and one-half per centum
upon the total cost of the construction of the entire buildings
and structures so built upon the same," viz., about $17,108.53.
" Said building commissioners, in the year 1871, made their first
annual report to the governor, and in the year 1872 made their
second annual report to the governor, and in the winter of 1873
specially reported to the legislature, and in all of said reports
stated the fact of the making of said contract with the plaintiff,
and the compensation agreed to be paid him, and the prepara-
tion by him, and adoption by them and the governor, of the
plans so by him prepared as aforesaid, and set forth, both in
general terms and in the latter report in detail, the contract
aforesaid. And such contract, and as well such plans and spec-
ifications, were by the governor and by the legislature ratified
and approved." By ch. 39, Laws of 1871, the legislature di-
rected the completion of the north wing and the construction

of rear buildings according to said plans, and appropriated the necessary funds therefor; by ch. 88, Laws of 1872, it directed the construction of the center building, and made the necessary appropriation; and by ch. 58, Laws of 1873, it made further appropriations to complete and perfect the uses of said hospital. During all said time, and for more than a year later, plaintiff was actually and continually engaged in the performance of said contract, and in the preparation of the detailed plans and specifications, and the superintendence of the construction of such buildings. About the 14th of November, 1872, the board of trustees for the Northern Hospital for the Insane, having been duly appointed, met and organized under ch. 176, Laws of 1872; and thereupon the aforesaid board of building commissioners ceased, and said board of trustees assumed the government of the institution, and the further charge of its construction and completion; and said board of trustees continued to carry out and perform, as the successors of said building commissioners, said contract with the plaintiff, for nearly eighteen months thereafter. By ch. 344, Laws of 1874, the legislature directed the construction of the south wing of said hospital; and the same was thereafter, during that and the following year, constructed and completed according to the plans and specifications prepared by the plaintiff, with slight alterations in some minor particulars. In pursuance of a resolution adopted by them at a meeting held on the 26th of March, 1874, said board attempted to discharge the plaintiff from his service under said contract, and prevented and forbade him from further performance of the service of superintendence of the construction of said south wing, and employed another person for that purpose. For this action the board of trustees had no reasonable or legal justification or excuse, but plaintiff had constantly and faithfully theretofore discharged, in an efficient and correct manner, all the duties resting upon him, and had so far discharged his said contract that nothing remained to be done thereunder except the superintendence of

the said south wing, and he was then ready, able and willing to superintend the completion thereof in an efficient and competent manner. The cost of construction of the north wing, rear building, central buildings, heating and ventilating apparatus, etc., completed under plaintiff's superintendence and according to his plans, between the date of the said contract and his dismissal, was $316,774.87; the cost of the construction of the south wing, after plaintiff's dismissal but according to his plans and specifications, was $172,081.80; making a total of $488,856.67, upon which plaintiff was entitled to receive for his compensation five per centum, or $24,442.83. Said building commissioners and said board of trustees, however, have allowed and paid him only the sum of $14,724.53, leaving justly due him thereon, $9,718.30, which they neglect and refuse to pay. The complaint then states two additional causes of action for $114 and $115 respectively, and alleges that, by reason of the premises, the state of Wisconsin is indebted to plaintiff in the sum of $9,982.30, with interest from March, 26, 1874; and that at the annual session of the legislature for the year 1877, plaintiff presented his said claim to the legislature, which refused to allow any part thereof; and it demands judgment for the amount above stated, with costs.

The state demurred to the complaint as not stating facts sufficient to constitute a cause of action.

*The Attorney General*, for the demurrer:

The contract having been made by public agents, they could bind the state only when acting within the scope of their authority. *Orton v. The State*, 12 Wis., 509; *Randall v. The State*, 16 id., 340. This contract was outside of the power conferred by ch. 39, Laws of 1870. That clearly contemplated only the erection of one wing for that year, to be completed by January 1, 1872 (secs. 6, 7); and the appropriation was of only $125,000 (sec. 10), a sum insufficient to build more than one wing. That the plans and specifications were to be procured only for the one wing, is shown by the clause in sec. 6,

" that the plan determined on by the board shall be such as
will admit of future enlargement .... and be, when ulti-
mately completed, of capacity not less than the present hospital
building at Madison." This clause was entirely unnecessary,
if plans, specifications and drawings were to be procured for
the whole building. The plural, " buildings," is used in sec.
7 with reference to the one wing, and the same word is used
in sec. 6, in providing for the plans, etc.; and both refer to the
wing which the commissioners were authorized to erect; clearly
limiting the power of the commissioners to plans for the wing,
but providing that the plans should be such as would " admit
of future enlargement so as to preserve the symmetry " of the
whole. It is difficult to see how the symmetry could be de-
stroyed if the plans and specifications for the whole were then
to be procured and contracted for. As to the rule of con-
struction, see *Harrington v. Smith*, 28 Wis., 43. It is quite
clear that the commissioners had no authority to contract for
superintendence beyond the one wing which they were to
erect. The agreement being void as in excess of the authority
granted, and no means being provided for the apportionment
of the price of each part, the whole fails; no action can be
maintained on the special contract, and the complaint should
be on *quantum meruit*. The subsequent acts of the legis-
lature are not a ratification of the contract. In each of these
acts the power to appoint and discharge a superintendent and
determine his compensation, is retained and reënacted. This
ignores the contract, and certainly precludes the idea of a
ratification. All the acts of the legislature gave the commis-
sioners power to discharge the superintendent at their discre-
tion. The plaintiff contracted with reference to this pro-
vision, and when he was discharged, whether with or without
cause, his right to compensation ceased. The most that can be
claimed is, that he may recover the five per centum of the cost
up to the time of his discharge, and, as to any other claim,
*quantum meruit*. The claim for plans and specifications,

however, involves necessarily an inquiry into their value as a whole; the contract furnishes no data or rule by which we can compute the relative value of plans, etc., as distinguished from superintendence; and plaintiff must, therefore, proceed on a *quantum meruit* for the whole service.

*W. F. Vilas*, for the respondent, analyzed at length the various acts of the legislature for the erection of the Northern Hospital for the Insane, and contended, 1. That the building commissioners had full authority, and it was their duty, under ch. 39 of 1870, to procure plans, etc., for the entire hospital, before commencing the erection of any part thereof; and that their action in that behalf had been fully recognized and ratified by subsequent acts of the legislature. 2. That although the commissioners had exceeded their authority in contracting for the service of the plaintiff as superintendent after the expiration of their term, yet the legislature had subsequently ratified the contract in that particular. The state, as party to a contract upon mutual considerations to be executed, becomes simply a contracting corporation, to be treated, at law and in equity, by the same rules that are applied to other corporations. But it is well settled that corporations may ratify the unauthorized acts of their agents by acts of recognition implying satisfaction with such acts. 2 Kent's Com., 291. This principle applies with full force to municipal corporations, when dealing as individuals or trading corporations, making contracts by which the property or services of an individual are obtained. *Mills v. Gleason*, 11 Wis., 470; *Knapp v. Grant*, 27 id., 147; *Pickett v. School District*, 25 id., 551. And the state cannot, more than any other corporation, suffer an agent to enter into a contract in its behalf, slightly overstepping his authority, and then, with knowledge of the facts, accept the fruits in whole or in part of that contract, without becoming a responsible party thereto. Having had the power to authorize the making of such a contract in the first place, the legislature may accept it when made for them, and they

may ratify it by implication, by indirectly referring to it, or proceeding upon its assumed validity, or by mere acquiescence. *Hasbrouck v. Milwaukee*, 21 Wis., 219, 236; *McCauley v. Brooks*, 16 Cal., 11, 26, 27; *Grogan v. San Francisco*, 18 id., 591; CLIFFORD, J., in *Supervisors v. Schenck*, 5 Wall., 772; *Winn v. City Council of Macon*, 21 Ga., 279. And the ratification of the legislature may be by other means than by public law. *State v. Buttles*, 3 Ohio St., 309. Plaintiff's contract was made in October, 1870. He immediately entered upon its performance, and continued openly and notoriously in the discharge of his duty under it until March, 1874. In 1871, the board of building commissioners reported to the governor, as required by law (sec. 5, ch. 39, Laws of 1871), and again in 1872. In these reports they state the plaintiff's employment, and what they had agreed to pay him. In 1873, the legislature required the contract, as written out, to be reported, and it was so done (Assembly Journal of 1873, pp. 210, 267, 405). By sec. 92, ch. 10, R. S. (Tay. Stats., 279), the governor was required to submit to the legislature all reports received by him. It is presumable, therefore, that the legislature had all the information necessary on the subject of this contract at the session of 1872; and in 1873 the contract is spread at length on the record of their proceedings. Moreover, the language of ch. 39, Laws of 1871 (especially secs. 2 and 3), shows that the legislature was in full possession of all the facts, and approved what had been done. The acts of the agents who made this contract were approved, and the product of. the contract accepted and made use of by the legislature, with ample knowledge of the facts; and this was undoubtedly a ratification. But it should be so treated, even if a doubt were felt as to their full knowledge. They were answerable as for full information, since, before they accepted the work and services, the product of the contract, they must be deemed to have intended to carry it out. It was a duty, due to the other contracting party, to *dissent*, if they did not approve.

Whatever may be said of acquiescence in other cases, failure to dissent from the liability is assent to it where the consideration is accepted in whole or in part. *Peterson v. Mayor, etc.*, 17 N. Y., 449; *Supervisors v. Schenck, Winn v. City Council* and *Hasbrouck v. Milwaukee, supra; Monaghan v. School District*, 38 Wis., 100. This ratification made the whole contract binding as an entirety. This principle is universal in respect to the acceptance of part of an unauthorized contract by the principal. *Farmers' L. & T. Co. v. Walworth*, 1 N. Y., 433, 447, and cases cited by Mr. Noyes on p. 438; *Cobb v. Dows*, 10 id., 335; *Benedict v. Smith*, 10 Paige, 126; *Moss v. Rossie L. M. Co.*, 5 Hill, 137; *Fargo v. Ladd*, 6 Wis., 106, 117; 1 Parsons on Con. (5th ed.), 51 et seq., and cases there cited. This doctrine has an especial application to an entire contract, where an entire and nonseverable price is agreed to be paid for two or more things to be done. It is there manifest that if the principal accepts part, he must pay the stipulated price, and must accept all that is to be done, if tendered according to the contract. *Miner v. Bradley*, 22 Pick., 457; 2 Parsons on Con. (5th ed.), 517 et seq. After the contract was so ratified, and after plaintiff had renewed his assent to it by continuing to perform it according to its terms, it became obligatory upon both parties, and protected by the constitutional limitation. *Clark's Ex'rs v. Van Riemsdyk*, 9 Cranch, 153, 159; *Smith v. Lascelles*, 2 Term, 188; *Smith v. Hodson*, 4 id., 211, 217. 3. That if the court should be of opinion that a state can avoid its action with individuals, under circumstances which would bind an ordinary corporation, and that plaintiff could lawfully be discharged from his service as superintendent before the completion of the hospital, still plaintiff had clearly a just claim to compensation on a *quantum meruit*, or on the basis of the contract price, for the plans, specifications and drawings, and for the work of superintendence actually done. *Hammond v. State Bank*, Walker (Mich.), 245; *King v. Brown*, 2 Hill,

485; *Pickett v. School District, supra; Trowbridge v. Barrett*, 30 Wis., 661; *Bishop v. Price*, 24 id., 480.

COLE, J.   We have no doubt that the building commissioners, under the 6th section of chapter 39, Laws of 1870, had authority to contract for and procure plans, drawings and specifications for the entire hospital building for the insane which it was proposed to erect.   It is true the act plainly intends that the commissioners should undertake to erect only such a portion of the building as might be completed and made ready for occupancy by the appropriation therein made. A further enlargement of the building was contemplated by the legislature, so as to make the entire hospital, when completed, of a capacity not less than the then existing hospital for the insane at Madison.   This is the obvious meaning and intent of the act, as gathered from the language used.   So that, whatever plans, drawings and specifications should be necessary and proper for the entire hospital, when completed, the commissioners were authorized to contract for and procure.   There was, however this limitation on the discretion of the commissioners in the selection of a plan, namely, that the general features of the new institution should be similar to the insane hospital at Madison, with such modifications as experience had shown to be desirable; and the plan determined on should be such as to admit of an enlargement of the building erected under the act, to the proposed capacity, without destroying its symmetry.   The complaint states that the commissioners entered into a contract with the plaintiff, in and by which he undertook to furnish full and complete plans, specifications and working drawings for the entire building, which agreement was within the scope of the authority of the commissioners, and became a binding obligation upon the state.   As it was contemplated that the entire hospital building should not be erected at the same time, but the wings and center building at different times, the learned attorney general argues

that under the 6th section the commissioners could only contract for plans and specifications for the wing which was to be erected and completed by January 1, 1872. We find ourselves unable to put such a construction upon the section when considered by itself; besides, the view we have indicated derives some support from the language of the next section, wherein it is provided that the commissioners, after having obtained "the proper plans of building," which should be approved by the governor, should advertise for sealed proposals for the erection of such buildings as were authorized by the act, commencing with one of the wings; and the board was empowered to enter into a contract with the lowest responsible bidder for the erection of such buildings. The word "building" seems to be used in different senses in the act; sometimes meaning a wing or portion of the hospital: then again referring to the entire work or completed institution. In the first part of the section it seems to be used in the latter sense.

By the 8th section, the commissioners were authorized to appoint a competent building superintendent, whose duty it was to superintend the work as it progressed, and whose compensation was to be determined by the board. Power was given the commissioners to discharge such superintendent at their discretion. This power was vested in the board for the public benefit, in order to secure the services of a faithful, competent superintendent of the work; and we do not think the commissioners could by contract waive that power, or debar themselves from the right to exercise that discretion. It was said by the learned counsel for the plaintiff, that the commissioners might bind themselves not to discharge a superintendent once appointed, and thus exhaust their discretion. But we think otherwise. The discretionary power was intended to be a continuing one, for the protection of the public, and could not be relinquished by the commissioners. If they attempted to relinquish it in the contract made with the

plaintiff, they exceeded their authority. For, in the most favorable view which can be taken of the plaintiff's case, the 8th section must be deemed to have entered into and become a part of the contract, controlling any inconsistent provisions therein.

It appears from the complaint that the commissioners contracted with the plaintiff for the plans and specifications for the entire hospital, and employed him to superintend the whole work, agreeing to pay for both services "five per cent. on the cost of construction." The plaintiff's counsel admits that there was an excess of authority on the part of the commissioners in making this contract; and there plainly was, in more than one particular. Excluding from view the question of ratification, which will presently be considered, the inquiry arises as to the plaintiff's rights under the circumstances. It appears that he superintended the work until the 26th day of March, 1874, when he was discharged from that service. The question is, What is he entitled to recover? So far as the contract was executed, there is no difficulty. The plaintiff can recover the contract price for his plans and specifications and services as superintendent up to the time of his discharge. He may further recover the value of his plans and specifications for that portion of the work which he did not superintend, on a *quantum meruit*. His discharge was within the lawful authority of the trustees under chapter 176, Laws of 1872. The contract affords no means or data, it is true, by which the relative value of the plans, etc., as distinguished from the value of superintending the work, can be ascertained. If, instead of fixing an entire sum for both services, the contract had stated what was to be paid for all the plans and specifications furnished, and what to be paid as compensation for services as superintendent, the amount of recovery could readily be ascertained. But as it is, the value of the plans, etc., for that part of the work which the plaintiff did not

superintend, must be a subject of proof; but in no event would he be permitted to recover more than the contract price for both services.

While admitting that the commissioners exceeded their authority in making the contract, the plaintiff's counsel claimed that there was a ratification thereof by the legislature. The complaint, we think, fails to show affirmatively a ratification; nor can a ratification be inferred from the facts stated. There can be no doubt that the legislature might ratify and confirm the unauthorized acts of the commissioners, and validate the contract. If, with full knowledge of all the facts and of the terms of the contract, the legislature recognized and acted upon it, making appropriations for completing the hospital building upon its assumed validity, a ratification would surely be presumed. The question is, Has the legislature done this? The matter relied on in the complaint to show such ratification is the enactment of chapter 39, Laws of 1871, chapter 88, Laws of 1872, and chapter 58, Laws of 1873. It is sufficient to say, in respect to the latter act, that it merely appropriates a sum of money "for the use of the Northern Hospital for the Insane." The two former acts in effect provide for the erection and completion of the center building and all the wings on the north side thereof, making appropriations for these objects. In each act the commissioners were authorized to enter into contracts for the construction of these buildings; but there is nothing to warrant the inference that the legislature was then in possession of the contract made with the plaintiff, knew its terms, or in any manner ratified or adopted it. There is a reference to a "plan adopted by the board and approved by the governor," but that is all. Presumably, it is said, the legislature had full information in regard to this contract in the reports made to it by the governor. But this inference is not legitimate nor necessary from the facts alleged. It is a material fact bearing on the question of ratification,

and should be distinctly alleged, if true. On the complaint as it now stands, we cannot say there was a ratification of the contract by the legislature.

It is alleged that the commissioners, in the year 1871, made their annual report to the governor, and in the year 1872 made their second annual report, and in the winter of 1873 specially reported to the legislature, and in all said reports stated the fact of the making of the contract with the plaintiff, and the compensation agreed to be paid him. We find in the Assembly Journal for 1873, that the commissioners made a report to that body in answer to a resolution calling for information, and that a copy of the contract accompanied the report. But we do not find that any action was taken by that body on the report, nor was any report made to the senate. We suppose we cannot take judicial notice of the matters stated in the Assembly Journal; and any ratification of the contract on the part of the legislature would properly appear in some resolution or law passed. In no other way could a ratification be made.

It follows from these views that the demurrer must be overruled.

